### State of Vermont v. John A. Settle

[442 A.2d 1314]

No. 220-80

Present: Barney, C.J., Billings, Hill, Underwood and Peck, JJ.

Opinion Filed March 16, 1982

60

*John A. Rocray*, Windham County State's Attorney, and *Martha M. Smyrski*, Deputy State's Attorney, Brattleboro, for Plaintiff.

*Thomas W. Costello*, Brattleboro, and *James L. Morse*, Defender General, and *William A. Nelson*, Appellate Defender, Montpelier, for Defendant.

Peck, J. Defendant John A. Settle and a companion as co-defendants were tried by jury and both convicted of committing an unlawful trespass in violation of 13 V.S.A. § 3705(c). Separate appeals were instituted. The companion's appeal was heard at the June 1981 Term of this Court, and the judgment was affirmed in *State* v. *Durling*, 140 Vt. 491, 442 A.2d 455 (1981).

The factual background of the offense itself is identical in all material respects to that described at length in *Durling*, accordingly there is no need to restate it here. To these facts, however, certain others should be added since questions relating to them, raised here, were not raised by the earlier appeal.

The offense occurred on January 22, 1980. On February 12th the brother of one of the defendants and the fiancee of the other, dressed in attire similar to that worn by the defendants on the date of the trespass, went to the residence of the complaining witness who had identified the defendants. The brother carried with him a tape recorder. Arriving at the witness's home they knocked and when he came to the door the brother asked, "I want to know how come you think it was us that broke in."

This stratagem was an effort to discredit the witness's positive identification of the two defendants. The effort backfired badly; the witness was not gulled by the deception. On the contrary, he reported the incident, and the imposters themselves were taken to the police station where they were detained for a short time and released. No charges were brought against them.

■■ In his brief appellant seeks to adopt by reference the six issues set forth in his co-defendant's brief. Thereafter he does not brief, cite appropriate authorities, or argue the application of these issues to his own situation. His apparent intent is to incorporate the entire companion-case brief into his own, also by reference. This is questionable briefing practice. We have held, and we reiterate here that, in all but a few exceptional instances, matters which are not briefed will not be considered on appeal. *Quazzo* v. *Quazzo*, 136 Vt. 107, 111, 386 A.2d 638, 641 (1978). See V.R.A.P. 28(a)(4). Moreover, this Court will not search the record in order to sustain a claim of error inadequately briefed, or hop back and forth between briefs of co-defendants in an exploratory effort to determine what impact, if any, the claims briefed on behalf of one appellant may have on similar claims made (by reference only) for the other. It should be noted, however, that the judgment below in the companion case has been affirmed; no error was discovered. *State* v. *Durling, supra.* We see no reason for a different conclusion here.

In addition to the six points which appellant sought to incorporate into his brief by reference, he raises and briefs three issues for review. We consider them in the order presented.

First, he claims error in the lower court's admission into evidence of the prosecuting witness's post-crime identification.

The reference here is to testimony by the complaining witness, elicited on redirect examination, describing the ill-conceived effort on February 12, 1980, to create a serious doubt as to the credibility of the witness's identification of the defendants.

Appellant contends that the testimony of the complaining witness was apparently admitted, first, on the grounds that the incident was an experiment, and, secondly, as a matter of custom or habit: "The offer was made for the inference that (the witness) was a person who habitually and customarily made proper identifications."

We are not called upon to review the failed deception as being an experiment, or in the light of custom or habit. The record simply does not support either as the basis on which the testimony was admitted. Moreover, there is no necessity that a witness be one who "habitually and customarily" identifies people, *i.e.*, that he is an "expert" in the field, if such there be, as a prerequisite to stating he recognized or did not recognize a person as someone he had identified earlier. There is even less reason for any such a foundation than for limiting sobriety opinions to experts in cases involving the effect of alcoholic beverages. See *State* v. *LaFleche,* 127 Vt. 482, 486, 253 A.2d 124, 128 (1969).

On cross-examination the witness was subjected to a long and determined effort to discredit his identification. Whatever effect the cross-examination may have had on the jury in weakening the impact of his initial identification, the State was properly allowed on redirect, in the discretion of the trial judge, to meet what had been developed on cross-examination, to explain away any tendency to discredit him that may have been accomplished. *State* v. *Tatko,* 119 Vt. 459, 463, 128 A.2d 663, 666 (1957). The materiality of the challenged evidence was thin, but in the light of the attack on the ability of the witness to identify the defendants, we conclude it was not an abuse of discretion by the trial judge to admit the testimony. It had some tendency, however insubstantial, to show that the witness was sufficiently positive in his identification of the defendants that he did not become

confused into accepting the imposters as the persons he had originally identified as the trespassers. Control of cross and redirect examination lies within the sound discretion of the trial court. *Id.*

The concurring opinion, while summarizing some legitimate concerns, expresses, we believe, undue alarm. This opinion should not be construed as giving *carte blanche* for all negative evidence; the rules relating thereto discussed in the concurrence remain virtually intact. Nor does it open the door to any random man-on-the-street "nonidentification," to adopt the word coined by the minority.

■ ■ The "nonidentification" here did not relate either to casual passers-by, nor to persons eliminated through the traditional line-up or through an examination of photographs. The very purpose of the February 12th masquerade was to disparage the witness's credibility, *i.e.*, his ability to identify the defendants. When this same credibility is as ably and exhaustively challenged as it was on cross-examination, we cannot agree that it was legal error (even if not prejudicial) to permit the questioned testimony on redirect. We hold only that under the facts and circumstances surrounding the offer made in the matter before us, and the purpose for which the offer was made, the admission of the testimony was a matter of judicial discretion. We will not frustrate that broad power by an unyielding insistence upon general rules, when, as here, we are satisfied that a special factual situation justified the trial court's decision.

■ Secondly, appellant contends the trial judge erred in excluding a tape recording of a conversation between the complaining witness and the two people who appeared at his residence on February 12, 1980. Admission was sought to show a claimed inconsistency between the recorded conversation and the witness's testimony as to the same interchange. If there was an inconsistency in fact, and a proper foundation established for admission of the tape, it might have been admissible for purposes of impeachment, although not to establish a fact. *State* v. *Young*, 139 Vt. 535, 538, 433 A.2d 254, 256 (1981).

On redirect, the witness gave the following account of the conversation:

The gentleman said, "Are you [giving the name of the witness]?" At that time I opened the door and said, "Yes, I am." And at that time the gentleman asked me why I had thought that they had broken into my house. And I answered as close as I can remember to, "Who are you? I don't know you." And the gentleman said thank you and left.

During the presentation of his case, appellant offered a tape recording of the same conversation, made by the brother of one of the defendants to show the actual conversation was not the same. The court listened to the tape out of the hearing of the jury and while much of it was inaudible, the following was recorded:

*The Brother:* I want to talk to you about the alleged break in.

*Witness:* Yeah, what about it?

*The Brother:* I want to know how come you think it was us that broke in.

*Witness:* What break in?

*The Brother:* All right. (Inaudible)

■ We will say at the outset that even if the recorded excerpt is the complete conversation between the brother and the witness, and there is no clear verification that it is, we are not impressed by appellant's claim of inconsistency. The two accounts are not contradictory, one with the other. The witness's account at trial is inconsistent only to the extent it is not word for word the same as the taped version. Indeed, if it were, it might suggest that the witness had merely "learned his lines" like an actor, and was reciting them by rote. In the courtroom, he was called upon to repeat a short conversation which occurred three months earlier. Under the circumstances he probably did well to remember it as accurately as he did. We conclude that the statement of the witness while on the stand was not inconsistent, in the sense urged by appellant, with his prior recorded statement. Moreover, even if the two statements were inconsistent, the proper foundation was not laid for introduction of the tape. At no time during the long and searching cross-examination of the

complaining witness by counsel for appellant was the earlier statement called to his attention, nor was he questioned about it; there was every opportunity to do so. Appellant's counsel was well aware of the tape while examining the witness; it was in the possession of the defense. The tape was properly excluded and no error appears. *State* v. *Young, supra.* See also *State* v. *Dragon,* 128 Vt. 568, 570, 268 A.2d 913, 914 (1970).

█ Appellant's concluding assertion is that the admission of the complaining witness's testimony concerning his post-offense confrontation with the two people who came to his residence, and the exclusion of the tape, combine to produce prejudicial and, accordingly, reversible error. Since we have found no fault with either ruling of the trial judge, appellant's last contention is unavailing; two negatives do not unite to form an affirmative.

*Judgment affirmed.*

**Hill, J.,** concurring. In this case, the defendant challenges his conviction for unlawful trespass on two evidentiary grounds. First, he asserts that the trial court erred in allowing redirect testimony by the complaining witness concerning an incident involving the defendant's brother. Second, he challenges the exclusion of a tape recording of the incident, which was offered by the defense to attack the complaining witness's credibility. The majority opinion concludes that the testimony concerning the incident was admissible, because "[i]t had some tendency, however insubstantial, to show that the witness was sufficiently positive in his identification of the defendants that he did not become confused into accepting the imposters as the persons he had originally identified as the trespassers." I write separately, because I believe this conclusion is in error.

I agree with the majority's statement that the trial court enjoys wide discretion in the control of cross-examination and redirect. This discretion, however, does not extend to the point of admitting irrelevant or immaterial evidence. Thus, the critical question is whether the witness's "nonidentification" meets the threshold standards of admissibility. I believe that it does not.

This Court has established a standard for the admissibility of all evidence: it must be logically and legally relevant. *State v. Patnaude,* 140 Vt. 361, 370, 438 A.2d 402, 405 (1981). Logical relevance is satisfied if the evidence tends to make the existence of a fact more probable or less probable. Yet, as Justice Underwood wrote, "[s]ome special relationship indicating a connection beyond mere similarity as to some particulars" is necessary. *Id.* A speculative, insubstantial tendency is not enough. "To have one fact prove another, . . . [t]hey must be linked together by the chain of cause and effect, in some assignable way, before the existence of one of the transactions will support an inference about the nature of the other." *Id.* at 371, 438 A.2d at 406. The "nonidentification" evidence in this case fails the *Patnaude* standard.

It is essential to note what was at issue concerning the identification of the defendants on redirect examination. Three general categories of evidence are opened by cross-examination. First, the witness's credibility could have been at issue. Second, his general ability to perceive, e.g., his eyesight and memory, could have been challenged. Third, the accuracy of his specific identification could be at issue. This final category encompasses subjects such as how long and under what conditions the witness saw the defendant, corroborating details, and the certainty of the identification. The trial court, in admitting the "nonidentification" testimony, referred to each of the three categories. The court stated that the evidence "has to do with the positiveness with which [the witness] can identify and recognize people that appear before him." (Tr. at 215). (See also Tr. at 217, 218). The prosecution asserted that the evidence supported the witness's credibility. (Tr. at 212). Finally, the Court noted that the nonidentification testimony reinforced the specific identification, as it supported the witness's "ability to say that these are not the people . . . that I saw before." (Tr. at 218). The trial court, like the majority opinion, noted that the defense had opened the door via cross-examination. (See Tr. at 217). Yet, the first mention of the "nonidentification" is on redirect, not cross-examination. Thus, admissibility turns on whether the evidence is probative under any of the three general categories.

. The evidence clearly fails as to credibility and the witness's general perception abilities. The only metric for testing the accuracy or veracity of the "nonidentification" is the identification, the very fact at issue. The evidence is merely cumulative. The witness could have consistently good perception, or, his perception could be consistently bad. See generally McCormick on Evidence 103–04 (2d ed. 1972).

The most beguiling, yet most suspect, ground for admissibility is that it supports the specific identification at issue. The evidence does not satisfy the prior consistent statement rule outlined in *State* v. *Roy*, 140 Vt. 219, 227, 436 A.2d 1090, 1093–94 (1981). Indeed, the evidence is not a prior consistent statement at all—it is merely a prior statement that is *not inconsistent* with the previous statement. This Court has, till now, required that such negative evidence show more than "a mere basis for speculation and conjecture," to be admitted. *Barney's Admrx.* v. *Quaker Oats Co.*, 85 Vt. 372, 387, 82 A. 113, 120 (1912). "Negative evidence is relevant and admissible when it tends to prove the *non*existence of a material fact." 1 Wharton's Criminal Evidence § 156, at 287 (13th ed. 1972) (emphasis supplied). See *Barney's Admrx.* v. *Quaker Oats Co.*, *supra*, 85 Vt. at 386–87, 82 A. at 120 (collecting examples). The witness testified that the defendants *were* the perpetrators. It is completely irrelevant that others were *not* the perpetrators. Simply put, when a witness testifies that "Y did not do it," it tells us nothing about the accuracy of his statement that "X did do it."

In testing identification testimony, courts are not interested in whether a witness can exclude suspects; rather we wonder whether the witness singled out the right persons. Certainty and accuracy are not proven by an ability to exclude individuals as suspects. The most unsure eyewitness would readily testify that countless individuals were not the perpetrators. Under the *Patnaude* standard such a "nonidentification" is logically irrelevant and, therefore, inadmissible.

Unfortunately, the majority opinion sets an unwise precedent: prosecutors may now utilize "nonidentification" testimony to buttress shaky witnesses. The majority, although purporting to limit this case to its facts, provides no principled basis for limiting this rule. Witnesses may now testify concerning who they did *not* select out of a line up, the

mug shots they did *not* select, and who was *not* at the scene of the crime. Apparently, any attack on identification during cross-examination will now open this door, as long as the "facts and circumstances" bring the evidence within the realm of "judicial discretion." At some point, "nonidentification" testimony will cumulate to the point of prejudice. Yet, under this decision, defendants will be remediless, as such evidence is relevant.

I would hold that the "nonidentification" testimony was irrelevant and inadmissible. I emphasize, however, that I would not reverse the conviction. Given the weight of the evidence of guilt, the error in admitting the "nonidentification" testimony was harmless error. Therefore, reversal is not warranted. See, e.g., *State* v. *Howe,* 136 Vt. 53, 60, 386 A.2d 1125, 1129 (1978); *State* v. *Miner,* 128 Vt. 55, 71, 258 A.2d 815, 824–25 (1969). Furthermore, exclusion of the tape recording itself was proper, as impeachment on collateral grounds is improper. See, e.g., *Isabelle* v. *Proctor Hospital,* 133 Vt. 200, 203, 333 A.2d 118, 121 (1975); *State* v. *Teitle,* 117 Vt. 190, 196–97, 90 A.2d 562, 567 (1952).

I concur in the judgment, but dissent from the reasoning of the majority. I am authorized to state that Mr. Justice Billings concurs in this opinion.